UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  Case No. 8:21-cr-327-SDM-CPT

MARGARETT MICHELE CHEVRY
_____/

**O R D E R**

Before the Court is the government's construed motion pursuant to 18 U.S.C. § 4241(d) for a determination regarding Defendant Margarett Chevry's competency. (Doc. 48). Based upon the evidence adduced at a hearing on the matter and for the reasons discussed below, the Court finds by a preponderance of the evidence that Chevry is presently suffering from a mental disease or defect rendering her mentally incompetent to the extent she is unable to understand the nature and consequences of the proceedings against her and to assist properly in her defense. The Court also finds for the reasons discussed below that Chevry must self-surrender for competency restoration training to a suitable facility designated by the United States Attorney General.

I.

In September 2021, Chevry was charged in an indictment with four counts of wire fraud and one count of conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349. (Doc. 1). Following her initial appearance, Chevry was released on bond. (Doc. 17).

1

In November 2022, the Court appointed Dr. Randy Otto, a licensed clinical psychologist, to examine Chevry and to prepare a report addressing her competency. (Doc. 37 at 1–2). That appointment was predicated on a September 2022 report by Dr. Scot Machlus, a clinical psychologist, who opined that Chevry was not competent to proceed with her case. *Id*. at 1; *see also* (Doc. 59-1). In March 2023, Dr. Otto issued his own report recommending that Chevry "be adjudicated incompetent to stand trial" as well. (Doc. 62-2). Subsequent to the issuance of Dr. Otto's report, Chevry sought and obtained an extension of time in which to investigate the matter of her competency. (Docs. 45, 46).

Several months later, in June 2023, the government moved unopposed for a competency hearing, which the Court scheduled for the end of that month. (Docs. 48, 49). At Chevry's request, however, the Court continued the hearing for a substantial period to allow Chevry a further opportunity to prepare for the proceeding. (Docs. 51, 52, 53). At the hearing, Chevry called Dr. Machlus and a neurologist, Dr. Mark Rubino, to testify on her behalf. (Doc. 65).[1] The government did not call any witnesses. *Id*.

During his testimony, Dr. Machlus opined that Chevry had a "major cognitive disorder due to vascular and/or Alzheimer's disease," and that she was not competent to proceed with her case "due to [her] intellectual and cognitive deficits." (Doc. 65 at 22–23). Dr. Machlus additionally offered that because of "the nature of [Chevry's]

---

[1] Immediately prior to the hearing, Chevry apparently experienced a medical episode stemming from dehydration and/or low blood pressure. (Doc. 65 at 4–9). Chevry's counsel represented to the Court at the start of the hearing, however, that Dr. Rubino—who was present at the time—confirmed Chevry had "physically recovered and [could] participate" in the proceeding. *Id*. at 9. The Court thereafter received testimony from Chevry's witnesses with the understanding that the government could later challenge the relevance of this evidence. *Id*. at 11–13.

2

neuro-cognitive disorder" and the attendant "deterioration of her memory, learning, [and] planning ability, it [was his] feeling that" her competency could not be restored. *Id.* at 29–30. Dr. Machlus acknowledged, however, that individuals "with similar diagnoses" to Chevry could "be restored to competency;" that Chevry herself might be able to improve in "some aspects," such as her factual understanding of the "probation process;" and that the record contained "some indication of possible malingering" by Chevry, although he did not have "enough information . . . to determine the validity" of that evidence. *Id.* at 29–34.

Dr. Rubino testified that based upon his review of Dr. Otto and Dr. Machlus's reports, as well as his analysis of various medical records, including an MRI of Chevry's brain, he believed Chevry displayed mixed-type dementia stemming from Alzheimer's disease and vascular damage in her brain. *Id.* at 43–44, 47–50. Dr. Rubino also opined that there was no medical treatment which could reverse Chevry's maladies and that he doubted her competency could be restored since the underlying conditions were both progressive and irreversible. *Id.* at 52–53. Dr. Rubino conceded, however, that the four-month period typically allotted for competency restoration training can be "very helpful" in determining the functioning and cognitive ability of dementia patients like Chevry and in ascertaining "where they stand in terms of . . . their ability to retain information, to follow instructions, [and] to discern something on their known." *Id.* at 59.

Following the hearing and the completion of the hearing transcript (Doc. 65), the parties submitted legal memoranda setting forth their respective positions on the issue

of Chevry's competency (Docs. 71, 74). In brief, Chevry requests that the Court find (1) she "suffers from the progressive, incurable, and untreatable condition of dementia resulting from Alzheimer's disease and vascular damage to [her] brain," and (2) "there is no period of time which is reasonable to hospitalize [her] for the purpose of evaluating her and attempting to restore her to competency[.]" (Doc. 71 at 15). The government counters, in short, that the Court should instead "find Chevry incompetent and commit her to the custody of the Attorney General" for restoration training. (Doc. 74 at 7).

## II.

The Court begins its analysis with the language of section 4241(d) of Title 18, United States Code, which provides, in pertinent part:

> If, after the hearing, the court finds by a preponderance of the evidence that [a] defendant is presently suffering from a mental disease or defect rendering [her] mentally incompetent to the extent that [s]he is unable to understand the nature and consequences of the proceedings against [her] or to assist properly in [her] defense, the court *shall commit the defendant to the custody of the Attorney General*. The Attorney General *shall hospitalize the defendant for treatment in a suitable facility . . . for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future [s]he will attain the capacity to permit the proceedings to go forward*.

18 U.S.C. § 4241(d) (emphasis added).

There is no dispute here that there is sufficient evidence for the Court to determine that Chevry "is presently suffering from a mental disease or defect rendering [her] mentally incompetent to the extent that [s]he is unable to understand the nature and consequences of the proceedings against [her] or to assist properly in [her] defense." 18 U.S.C. § 4241(d); *see also* (Doc. 74). The Court agrees with this assessment and so finds.

4

The parties do quarrel, however, as to whether section 4241(d) demands that Chevry be committed to the custody of the Attorney General for competency training. (Doc. 74). Citing the Due Process Clause, Chevry encourages the Court to answer this question in the negative because, in her view, the evidence at the competency hearing "overwhelmingly" established that "there is no 'substantial probability . . . [she] will attain . . . capacity in the foreseeable future.'" (Doc. 71 at 1–2, 8–9) (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)).[2]

Chevry's argument appears to be foreclosed by Eleventh Circuit precedent, which can be fairly read as requiring courts to remand defendants to the Attorney General's custody under section 4241(d) once they are found to be incompetent. *See United States v. Cobble*, 724 F. App'x 753, 754 (11th Cir. 2018) (per curiam)[3] ("A district court has no authority to circumvent the statutory mandate that a person found mentally incompetent must be committed to the Attorney General for hospitalization.") (citations omitted); *United States v. Donofrio*, 896 F.2d 1301, 1303 (11th Cir. 1990) ("Once the court found by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to stand trial, then it was required 'to commit the defendant to the custody of the Attorney General.' The permanency of the condition would then be determined for later consideration by the court."). Other

---

[2] The Supreme Court held in *Jackson* that it was unconstitutional to confine an incompetent defendant beyond the reasonable period necessary to decide whether there was a substantial probability the defendant could attain mental competency for trial. 406 U.S. at 731–33. An "indefinite commitment of a criminal defendant solely on account of his incompetency to stand trial," the Court reasoned, did "not square with the Fourteenth Amendment's guarantee of due process." *Id.* at 731.

[3] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority. 11th Cir. R. 36-2.

Courts of Appeal have seemingly reached a similar conclusion. *See*, *e.g.*, *United States v. Magassouba*, 544 F.3d 387, 404 (2d Cir. 2008) ("[I]n contrast to the discretion afforded district courts in deciding whether to commit a defendant for a preliminary competency examination, once a defendant is found incompetent, commitment pursuant to [section] 4241(d) is mandatory.") (internal citations omitted); *United States v. Ferro*, 321 F.3d 756, 761 (8th Cir. 2003) (finding that the involuntary hospitalization and commitment to the custody of the Attorney General is required by the language of section 4241(d)); *United States v. Filippi*, 211 F.3d 649, 651 (1st Cir. 2000) (stating that section 4241(d) establishes a general rule of commitment without a "case-by-case choice by the district court as to whether to incarcerate once the incompetency finding has been made").

Even were the Court to deem it had discretion on the matter, it would still remand Chevry to the Attorney General's custody under section 4241(d) given the testimony and exhibits introduced at the hearing. Suffice it to say that the Court does not find this evidence to be as favorable to Chevry on the question of restorability as she now claims it to be. *United States v. Brennan*, 928 F.3d 210, 217–18 (2d Cir. 2019).

Chevry alternatively asks that the Court impose "extremely strict conditions" on her confinement, such as directing the government to certify that the Bureau of Prisons (BOP) medical professionals who will examine her have reviewed all relevant records before she reports for hospitalization; limiting her hospitalization to a local facility and to a number of hours or days; and requiring regular, expedited reports from the BOP as to the status of their evaluation of Chevry and any proposed restoration plan. (Doc. 71). To buttress this request, Chevry attaches to her memorandum the sworn declaration of

Dr. Dia Boutwell, who is the Chief of the BOP's Psychological Services Branch. (Doc.71-1). Chevry argues:

> There is ample evidence that the [BOP] is constrained by a lack of resources and is consistently unable to admit defendants to federal medical facilities within a time frame which is limited to the time reasonably required to identify a suitable facility and arrange for transport. Per [Dr. Boutwell], . . . typically the wait time to enter a medical facility for a 4241(d) evaluation and restoration treatment is approximately eight to [twelve] months depending on [the] current demand. . . .
>
> * * *
>
> [The Supreme Court's decision in] *Jackson* does not allow for the pre-hospitalization commitment period to last longer than the maximum time Congress permitted for the period of hospitalization itself. . . . [As a result, s]hould the Court order that . . . Chevry be committed to a federal medical facility, it should impose strict conditions on the commitment process to ensure that [she] is not subject to unnecessary time in custody as a result of resource allocation choices made by the [BOP].

(Doc. 71 at 13–14) (footnote, internal citations, and quotation marks omitted).

The government opposes Chevry's proposed conditions. (Doc. 74 at 6–7). It does agree, however, that Chevry should be allowed to self-report to the facility designated by the Attorney General given the expected "delay in BOP bed space becoming available." *Id*. at 7.

The Court declines Chevry's invitation to impose the suggested conditions at this juncture, especially those which would permit only local hospitalization or a truncated confinement period. The Court questions whether it has the authority to authorize such restrictions and—as the government points out in its memorandum (Doc. 74 at 6)—Chevry notably does not cite any case law establishing that the Court does have such power. Regardless, any consideration of the propriety of such limitations on the BOP is

7

better left until after the healthcare providers and other experts affiliated with the BOP have received and analyzed the necessary information, including that obtained through an in-person examination of Chevry.

### III.

In light of the above, it is hereby ORDERED as follows:

1. At a date to be established as set forth below, pursuant to 18 U.S.C. § 4241(d)(1), Chevry shall be committed to the custody of the Attorney General, who shall hospitalize Chevry for treatment in a suitable facility for such a reasonable period of time, not to exceed four months, as is necessary to assess whether there is a substantial probability that in the foreseeable future Chevry will attain the capacity to permit the proceedings in this action to go forward.

2. Within this four-month period, the Director of the designated facility shall advise the Court of Chevry's status. If necessary, the Court will entertain a request for an additional reasonable period of commitment as authorized under 18 U.S.C. § 4241(d)(2).

3. The parties shall furnish the Director of the designated facility with any information that relates to the issue of Chevry's competency, including the charging instrument, any pertinent medical records, and any relevant law enforcement reports.

4. If the Director of the designated facility concludes Chevry has recovered to such an extent that she is able to understand the nature and consequences of the proceedings against her and to assist properly in her defense, the Director shall file a certificate to that effect with the Clerk of Court.

5. With respect to the date on which Chevry shall be committed to the custody of the Attorney General, the government shall promptly file a notice advising Chevry and the Court of the facility to which Chevry has been designated for treatment once such facility has been determined. Within three (3) days of the filing of the government's notice, Chevry shall report to the designated facility. The failure of Chevry to do so shall be deemed to be a violation of her pretrial release conditions.

6. Upon the conclusion of Chevry's treatment at the designated facility, she shall return to her residence in Tampa, Florida. Defense counsel shall promptly advise the Pretrial Services Office upon Chevry's completion of her treatment and the date upon which she is expected to return to Tampa.

SO ORDERED in Tampa, Florida, this 8th day of January 2024.

*[Signature]*
HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

Copies to:
Counsel of record